**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

MARCUS TAYLOR                                                        PLAINTIFF/PETITIONER
Reg. #62930-037

V.                                        No. 2:20-CV-207-LPR-JTR
                                          (Related: 2:20-CV-208-LPR-JTR
                                           2:20-CV-209-LPR-JTR
                                           2:20-CV-210-LPR-JTR
                                           2:20-CV-212-LPR-JTR
                                           2:20-CV-213-LPR-JTR)

DEWAYNE HENDRIX,
Warden, FCI-Forrest City;
MICHAEL CARVAJAL, Director,
BUREAU OF PRISONS; and
UNITED STATES OF AMERICA                  DEFENDANTS/RESPONDENTS

## RECOMMENDED DISPOSITION

This Recommended Disposition has been sent to United States District Judge

Lee P. Rudofsky. You may file written objections to all or part of this

Recommendation. If you do so, those objections must: (1) specifically explain the

factual and legal basis for your objection; and (2) be received by the Clerk of this

Court within fourteen (14) days of the date of this Recommendation. By not

objecting, you may waive the right to appeal questions of fact.

### I. Introduction

On October 23, 2020, Plaintiffs Marcus Taylor ("Taylor"), Robert Vaughan

("Vaughan"), Frank Skinner ("Skinner"), Bobby Wells ("Wells"), Harold Allen

("Allen"), and Brian Mahaney ("Mahaney"), all of whom are incarcerated in the "Low Institution" of the Federal Correctional Institution in Forrest City, Arkansas ("FCI/FC"), filed a *pro se* "Complaint Class Action for Declaratory and Injunctive Relief and Petition for Writ of Habeas Corpus Immediate Relief Requested." *Doc. 1.* After screening this pleading, the Court dismissed the § 2241 habeas petition, without prejudice, and recharacterized Plaintiffs' Complaint as asserting separate *Bivens* actions on behalf of each Plaintiff challenging the allegedly unconstitutional conditions of confinement in FCI/FC during the COVID-19 pandemic. *See Doc. 4; Doc. 5; Doc. 10.*[1]

Because the separate *Bivens* actions all involved common questions of fact and law, the Court later consolidated the cases, pursuant to Fed. R. Civ. P. 42(a)(2), and the parties were directed to file all future pleadings and papers only in *Taylor v. USA, et al.,* Case No. 2:20-CV-207, which was designated the lead case. *Doc. 12.*

---

[1] Plaintiffs have since filed a Motion for Reconsideration in which they request "this Honorable Court to revert back to the original 28 U.S.C. § 2241 [petition]." *Doc. 53.* It appears one of the reasons Plaintiffs make this request is so they will be charged the $5 filing fee for a habeas action, instead of the $350 filing fee for their properly characterized *Bivens* actions. *See* 28 U.S.C. § 1914(a).

In the Order holding that each Plaintiff must be assessed a $350 filing fee, I gave each of them the opportunity to file a Motion to Voluntarily Dismiss their *Bivens* actions by June 16, 2021, and thereby avoid being assessed the $350 filing fee. *Doc. 48 at 4–5.* None of the Plaintiffs accepted this offer, and it is now too late for them to do so.

Accordingly, the Motion for Reconsideration (*Doc. 53*) should be DENIED, and *each* Plaintiff should be assessed the full $350 filing fee.

On April 23, 2021, Defendants, United States of America, DeWayne Hendrix, the Warden of FCI/FC ("Warden Hendrix"), and Michael Carvajal, the Director of the Bureau of Prisons ("BOP"), filed a Motion to Dismiss or in the Alternative Motion for Summary Judgment (*Doc. 34*), Memorandum of Law (*Doc. 35*), and Statement of Undisputed Facts (*Doc. 36*). Defendants' threshold argument is that, because each Plaintiff failed to exhaust his administrative remedies, as mandated by the Prison Litigation Reform Act ("PLRA"), they are entitled to summary judgment.[2] To establish Plaintiffs' failure to exhaust, Defendants' Statement of Undisputed Facts relies on: (1) the Declaration of Aleshia Morris, the Administrative Remedy Clerk at FCI/FC (*Doc. No. 35-1*); and (2) a copy of the Administrative Remedy filing history for each Plaintiff (*Doc. 35-2* at Attachments G, H, I, J, K, and L).

On May 14, 2021, Plaintiffs filed a Response in Opposition in which each Plaintiff *admits* he failed to exhaust administrative remedies on his *Bivens* claims. *Doc. 46; Doc. 47*. However, they argue that Defendant Hendrix, as Warden of FCI/FC, and his subordinates, "thwarted" them from using the Administrative

---

[2] In their motion papers, Defendants also argue that Plaintiffs claims should be dismissed because: (1) Plaintiffs' claims for money damages are barred by sovereign immunity; (2) Plaintiffs plead no *specific* allegations of wrongdoing against any Defendant; (3) Plaintiffs failed to alleged sufficient injury; and (4) Plaintiffs failed to establish entitlement to injunctive or prospective relief. *Doc. 35 at 7–13*. Because Plaintiffs' claims should be dismissed based on their failure to exhaust administrative remedies, the Court need not address Defendants' other alleged grounds for dismissing Plaintiffs' claims.

Remedy Program provided for in 28 C.F.R. §§ 542.10–542.19; thereby making those administrative remedies "unavailable."[3] To support their claims of being thwarted, each Plaintiff submits a separate Affidavit which tell conflicting and facially improbable stories about being unable to initiate and exhaust their administrative remedies during the COVID-19 pandemic. Importantly, none of their stories are supported by *any* attached documents to substantiate their conclusory allegations of being thwarted.[4] Taken together, the glaring absence of *any evidence* to support their

_____

[3] In *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Court described three ways in which an administrative remedy can be make "unavailable" to an inmate:

> First,…an administrative procedure is unavailable when…it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.
>
> *****
>
> Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use…When rules are "so confusing that ... no reasonable prisoner can use them," then "they're no longer available."
>
> *****
>
> And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation…And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures.

*Id.* at 1859–60 (internal citations omitted).

[4] On June 18, 2021, Defendants filed a Reply (*Doc. 52*), and supporting Declaration from Tracy Holst ("Holst") (*Doc. 52-1*), a Correctional Counselor at FCI/FC. Several Plaintiffs allege in their Affidavits that Holst was personally involved in thwarting them from receiving responses to their informal resolutions, the first step in the BOP's exhaustion process. Among other things, Holst states that, while he does not recall whether he received any informal resolutions from Plaintiffs, no one ever "ordered [him] not to accept Informal Resolution Forms and [he] did accept numerous [such] forms throughout the pandemic." Declaration of Tracy Holst at ¶¶ 6 and 8. Because Plaintiffs' Affidavits fail to raise a genuine issue of material fact to support their claims of being "thwarted," it is not necessary for the Court to consider Holst's Affidavit to resolve the exhaustion issue.

excuses for failing to exhaust their administrative remedies created the strong impression that Plaintiffs' Affidavits are made out of whole cloth.

For the reasons explained below, Plaintiffs have failed to create a genuine issue of material fact relevant to their undisputed failure to exhaust the administrative remedies there *were available* to them. Accordingly, Defendants' Motion for Summary Judgment should be granted.

## II. Discussion

### A. The PLRA Requires a Federal Prisoner to Exhaust Administrative Remedies

The PLRA provides that: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The purposes of this exhaustion requirement include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007). It is now well settled law that the PLRA's exhaustion requirement is *mandatory*. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019).

In *Porter v. Nussle*, 534 U.S. 516, 524 (2002), the Court held that the PLRA's exhaustion requirement also applies to *Bivens* actions in which federal prisoners allege their constitutional rights were violated: "Federal prisoners suing under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999 (1971), must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit."

Finally, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218; *see also Woodford*, 548 U.S. at 90 (explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so properly so that the agency addresses the issues on the merits.") Thus, federal prisoners must raise their complaints at each step in the BOP's administrative exhaustion process *before* they can properly pursue those claims in a *Bivens* action.

**B. To Exhaust Administrative Remedies, Each Plaintiff was Required to Initiate an Informal Resolution Raising Their Conditions of Confinement Complaints and Then Proceed Through Three Levels of Administrative Review.**

The BOP's Administrative Remedy Program is codified in the Code of Federal Regulations. *See* 28 C.F.R. § 542.10 *et. seq.* These regulations, as they apply to the facts in this case, are discussed below.

The Warden, Regional Director, and General Counsel must: (1) "establish procedures for receiving, recording, reviewing, investigating and responding to

Administrative Remedy Requests or Appeals submitted by an inmate" (28 C.F.R. § 542.11(a)(1)); (2) "acknowledge receipt of a Request or Appeal by returning a receipt to the inmate" (§ 542.11(a)(2)); (3) "Conduct an investigation into the Request or Appeal" (§ 542.11(a)(3)); and (4) "Respond to and sign all Requests or Appeals filed at their levels" (§ 542.11(a)(4)).

Absent several exceptions that do *not* apply in this case, a federal prisoner must begin the administrative exhaustion process by filing an "informal resolution" with staff on a form called a BP-8.[5] The staff member "shall attempt to informally resolve the issue." § 542.13(a). If that attempt fails, the prisoner must submit a Request for Administrative Remedy to the Warden on a form called a BP-9.[6] *Id.*; § 542.14(a).

The deadline for submitting a timely "informal resolution [BP-8] and… Administrative Remedy Request [BP-9]…is *20 calendar days following the date on which the basis for the Request occurred.*" § 542.14(a). Because the BP-8 *and* BP-9

---

[5] A blank copy of a BP-8 "Informal Resolution", marked Exhibit A, is attached to this Recommended Disposition. BP-8 forms are publicly available on the Bureau of Prison's website: https://www.bop.gov/policy/forms/BP_A0148.pdf (last visited July 20, 2015).

In Plaintiffs' Response to Defendants' Motion for Summary Judgment (*Doc. 46*) and in Taylor's attached Affidavit (*Doc. 46 at 7*), references are made to Plaintiffs submitting "cop-outs." Apparently, many federal inmates refer to BP-8s as "cop-outs." *See* D.C. CORRECTIONS INFORMATION COUNSEL, *CIC Info Sheet: BOP – Administrative Remedies (aka "Grievance") Program*, https://cic.dc.gov/page/cic-info-sheets (last visited July 20, 2021); *see also* FED. BUREAU OF PRISONS, *FCC Forrest City, Arkansas Admission & Orientation Manual*, at 62, https://www.bop.gov/locations/institutions/for/FOX_aohandbook.pdf (last visited July 20, 2021).

[6] A blank copy of a BP-9, "Administrative Remedy Request," marked Exhibit B, is attached to this Recommended Disposition.

must be submitted *within 20 days of the underlying incident or event*," this regulation makes it clear that a prisoner is *not* required to receive a response to his informal resolution (BP-8) before filing an Administrative Remedy Request (BP-9). *Id.*

The BP-9 must be signed and dated by the inmate and submitted "to the institution staff member designated to receive such Requests (ordinarily a correctional counselor)." § 542.14(c)(4). The Request "is considered filed on the date it is logged into the Administrative Remedy Index as received." § 542.18.[7] The Warden has 20 calendar days from the filing date to issue a written response." *Id.* "If the inmate does not receive a response within the time allotted for reply, including [any] extensions, the inmate may consider the absence of a response to be a denial at that level." *Id.*

If the Warden denies the Request for Administrative Remedy (BP-9),  either in a written response *or* by failing to provide a response within 20 days of its submission, the prisoner "may submit an Appeal on the appropriate form (BP-10)[8] to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response. An inmate who is not satisfied with the Regional Director's

---

[7] Prisoners are directed to obtain the appropriate filing forms from "institution staff (ordinarily, the correctional counselor)." § 542.14(c)(1). Prisoners are "encouraged" to retain copies of all of their administrative filings "for his or her personal records." § 542.14(c)(3).

[8] A blank copy of a BP-10, marked Exhibit C, is attached to this Recommended Disposition.

response may submit an Appeal on the appropriate form (BP-11)[9] to the General Counsel within 30 calendar days of the date the Regional Director signed the response." § 542.15(a).

An inmate's appeal to the Regional Director must be accompanied by "one complete copy or duplicate original of the institution Request [BP-9] and response." § 542.15(b)(1). Appeals to the General Counsel must be accompanied by "one complete copy or duplicate original of the institution and regional filings and their responses." *Id.* Thus, in order to comply with the filing requirements in § 542.15(b)(1), an inmate *must* make and retain copies of *his*: (1) BP-9s; (2) the Warden's responses to those BP-9s; (3) BP-10s; and (4) the Regional Director responses to those BP-10s.[10]

Finally, the Administrative Remedy Program contains a "sensitive issue" provision that allows a prisoner to bypass filing a BP-8 and BP-9, at the institution level, and submit an Administrative Remedy Request directly to the Regional Director:

> Sensitive issues. If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request [BP-9] directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in

---

[9] A blank copy of a BP-11, marked Exhibit D, is attached to this Recommended Disposition.

[10] If an inmate does not receive a response to a BP-9 or BP-10, "the inmate may consider the absence of a response to be a denial at that level" and can then proceed to the next level of review. § 542.18.

writing, the reason for not submitting the Request at the Institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted.

§ 542.14(d)(1).

All the foregoing provisions of the Administrative Remedy Program are important to keep in mind in evaluating: (1) the plausibility of Plaintiffs' conclusory allegations claiming that each of them was "thwarted" from exhausting their administrative remedies; and (2) why *none* of those allegations of being "thwarted" are supported by copies of *any* of the BP-8s and BP-9s that Plaintiffs claim they submitted but were never responded to by FCI/FC staff or Warden Hendrix.

### C. Morris' Declaration Establishes That Each Plaintiff Failed to Exhaust His Available Administrative Remedies.

The Declaration of Aleshia Morris ("Morris") (*Doc. 35-1*) and six attachments (*Doc. 35-2*) are the source documents for Defendants' Statement of Undisputed Facts (*Doc. 36*). Morris is the current Secretary for the Associate Warden of FCI/FC, and the "Administrative Remedy Clerk" for the "Low Institution." *Doc. 35-1 at ¶1.* Morris' duties include "maintaining the Warden's Administrative Remedy files and tracking compliance with investigation and response deadlines." *Id. at ¶2.* Morris states that she is "familiar with the petitioners in these cases and the claims presented in their pleadings." *Id.* Finally, as part of her "official duties," Morris has "access to records maintained in the ordinary course of business by the Bureau [of Prisons], including central and administrative remedy files." *Id. at ¶3.*

In paragraphs 5 through 8 of her Declaration, Morris explains the "four level administrative procedure" that FCI/FC prisoners must complete to exhaust their administrative remedies. *Id.* She notes that a proper Administrative Remedy Request (BP-9) can only contain:

> …a single complaint or a reasonable number of closely-related issues on the form. If the inmate includes on a single form multiple or unrelated issues, the submission shall be rejected and returned without response and the inmate shall be advised to use a separate [BP-9] form for each unrelated issue.

*Id. at ¶9* (citing 28 C.F.R. § 542.14(c)(2)).

Morris states that *all* Administrative Remedy Requests submitted by inmates are "recorded and maintained in SENTRY, a computer-based information system available at each institution." *Id. at ¶10.* If a prisoner's BP-9 is rejected or denied by the Warden, the prisoner must appeal to the Regional Office using a BP-10 form. If the Regional Office denies the appeal, the prisoner must use a BP-11 form to appeal to the General Counsel. *Id. at ¶6.* The BP-10s and BP-11s are also "recorded and maintained" in SENTRY. Finally, Morris states that: "Any submission [BP-9, BP-10 or BP-11] from an inmate, whether accepted or rejected at any level, is permanently recorded [in SENTRY]." *Id. at ¶10.*[11]

Morris used SENTRY to access and review each Plaintiff's complete Administrative Remedy Record. According to SENTRY, two Plaintiffs, Taylor and

---

[11] Apparently, BP-8 "Informal Resolutions" are not entered into the SENTRY system.

Mahaney, have never submitted a single BP-9, BP-10, or BP-11 during their incarceration in the BOP. SENTRY also establishes that the other four Plaintiffs, Vaughan, Skinner, Wells, and Allen, *all successfully submitted BP-9s during the COVID-19 pandemic (2020 and 2021), which raised conditions of confinement complaints related to the pandemic*. While none of these BP-9s were fully exhausted after they were denied or rejected by Warden Hendrix, the undisputed fact that they successfully submitted them casts grave doubts on the plausibility of their conclusory allegations of being thwarted from submitting *any BP-9s* raising complaints related to their conditions of confinement during the COVID-19 pandemic.[12]

---

[12] Taylor's Affidavit is dated May 11, 2021, and the Affidavits of Vaughn and Mahaney are dated May 10, 2021. *Doc. 46 at 8, 10, 17*. The Affidavits of Skinner and Allen are not dated, but, because they are attached to Plaintiffs' Response to Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment, filed with the Court on May 14, 2021, those two Affidavits would have been signed about the same time as Taylor, Vaughn, and Mahaney's Affidavits. For unknown reasons, Wells separately filed his Affidavit, which is dated May 20, 2021. *Doc. 47*.

Importantly, the Affidavits of Vaughn, Skinner, Wells, and Allen *fail to mention* that they each *successfully filed BP-9s with Warden Hendrix on various dates in 2020 and 2021*, raising complaints that were related to the pandemic. While some of these BP-9s were filed after Plaintiffs initiated this action on October 23, 2020, they are still relevant to the extent they undermine the claims made by those four Plaintiffs, in their May 2021 Affidavits that, *throughout the pandemic*, they were thwarted from exhausting their administrative remedies.

**D. Each Plaintiff's Administrative Remedy Record.**

1. Taylor

During his incarceration, Taylor did not submit *any* Administrative Remedy Requests (BP-9s). *See* Morris' Declaration at ¶12 (*Doc. 35-1*) and Attachment G (*Doc. 35-2*).

2. Vaughan

During his incarceration, Vaughn submitted fourteen Administrative Remedy Requests. However, he only fully and properly exhausted three of those Requests, each of which raised concerns or complaints about matters that were *completely unrelated* to the conditions of confinement claims he is asserting in this lawsuit.[13] *See* Morris' Declaration at ¶13 and Attachment H.

On January 14, 2021, Vaughan submitted Administrative Remedy Request 1064953-F1 which sought: (a) "home confinement because of COVID-19;" (b) "proof of protective measures taken by FCC-Forrest City against COVID-19;" and (c) "adjustments to his Violent Public Safety Factor." Morris' Declaration at ¶14.

---

[13] In Administrative Remedy Request 931449-F1 submitted on February 18, 2018, Vaughan raised issues about the "removal of public safety factors [PSF]." The BP-11 final appeal was denied by the General Counsel on August 2, 2018. In Administrative Remedy Request 997298-F1, submitted on November 18, 2019, Vaughan sought an appointment with the outside doctor. The BP-11 final appeal was denied by the General Counsel on March 2, 2020. In Administrative Remedy Request 1040987-F1, submitted on August 20, 2020, Vaughan sought a waiver of "public safety factors." The BP-11 final appeal was denied by the General Counsel on February 6, 2021.

*Because this Request raised multiple unrelated complaints or concerns,*[14] Morris states that it "was rejected on January 15, 2021." Morris goes on to note that "[despite] being instructed to resubmit his unrelated claims on separate [BP-9] forms,[15] Vaughan did not do so." *See* Morris' Declaration at ¶¶ 9 and 14, and Attachment H. Finally, Morris states that Vaughan did *not* file the required BP-10 to appeal the Warden's rejection of #1064953-F1 to the Regional Office.[16] Morris' Declaration at ¶15.

Morris' Declaration and Attachment H prove that, *during the pandemic*, Vaughan *successfully submitted* one BP-9 to Warden Hendrix raising COVID-19 concerns. After it was rejected, Vaughan did not follow any of the steps he was instructed to take to properly assert and exhaust those claims. This is strong and undisputed evidence that, contrary to Vaughn's factually unsupported allegations, the administrative remedy process *was available* to him and other FCI/FC inmates during the pandemic.

3. Skinner

On April 5, 2021, Skinner submitted Administrative Remedy Request 107541-F1 which complained "about surgery delay," a situation that likely resulted from the ongoing pandemic. *See* Attachment I to Morris' Declaration. This BP-9

---

[14] *See* 28 C.F.R. § 542.14(a) and (c)(2).
[15] *See* 28 C.F.R. § 542.17(b).
[16] *See* 28 C.F.R. § 542.17(c).

was rejected by the Warden on the same day it was submitted, and Skinner did *not* appeal to the Regional Director. According to SENTRY, this is the only BP-9 Skinner has filed during his incarceration.

The undisputed fact that Skinner successfully initiated this BP-9 is *contrary to* the factually unsupported allegations in his May 2021 Affidavit that the administrative remedy process was made *unavailable* to him and other FCI/FC inmates during the pandemic.

4. Wells

During his incarceration, Wells submitted two Administrative Remedy Requests. *See* Morris' Declaration at ¶17 and Attachment J. In his first Request, which was submitted on July 31, 2019, Wells sought an "outside doctors appointment." *Id*. It was denied by Warden Hendrix on August 19, 2019 (986015-F1); denied by the Regional Director on September 30, 2019 (986015-R1); and denied by the General Counsel on January 22, 2020 (986015-A1). *Id.* Although Wells raised and fully exhausted 986015, *in 2019*, the complaint he raised had nothing to do with the conditions of confinement claims he is asserting in this action, all of which arose during the COVID-19 pandemic which began in *early 2020*.

Wells' second Administrative Remedy Request was received by Warden Hendrix on October 30, 2020, within a week of Wells filing this action of federal

court. In this Request, Wells complained "there is no hot water." *Id.* Warden Hendrix denied the Request on November 3, 2020, and *Wells did not appeal.*

The fact that Wells was able to access the administrative remedy process, by successfully submitting this BP-9, seriously undermines the claims in his Affidavit that he and other inmates were thwarted from filing *any* BP-9s during the pandemic.

5. Allen

During Allen's incarceration, he submitted eight Administrative Remedy Requests, each of which raised complaints about his medical care. However, only one of those BP-9s (980102-F1), submitted on June 7, 2019, was fully exhausted. In this BP-9, Allen complained about "wanting medication for pain." On June 10, Warden Hendrix denied it. On October 7, 2019, the General Counsel denied Allen's final appeal (980102-A1). *See* Morris' Declaration at ¶18 and Attachment K. Because this fully exhausted Administrative Remedy involved pre-pandemic complaints, it is not relevant to any of the claims Allen is asserting in this action.

On August 18, 2020, *during the pandemic* and about two months before Allen initiated this action in federal court, he submitted an Administrative Remedy Request (1041016-F1) to Warden Hendrix asking to be "seen by a doctor." It was denied on August 26, 2020 and Allen did *not* appeal. *Id.* To the extent this is one of the claims Allen is seeking to pursue in this action, he clearly failed to exhaust the administrative remedies that *were available* to him.

16

Finally, on January 29, 2021, *during the pandemic*, Allen submitted an Administrative Remedy Request (1066844-F1) to Warden Hendrix for "pain management." After it was denied on February 8, 2021, Allen appealed to the Regional Director (1066844-R1), who denied the BP-10 on April 6, 2021. Because Allen did *not* appeal to the General Counsel, he failed to fully exhaust this Administrative Remedy (1066844). *Id.*

The fact that Allen successfully submitted these two BP-9s, *during the pandemic*, is more strong and indisputable evidence in direct conflict with the factually unsupported statements in his Affidavit.

6. <u>Mahaney</u>

During Mahaney's incarceration, he did "not submit any Administrative Remedy [Requests] filings over any issue." *See* Morris' Declaration at ¶19 and Attachment L. Mahaney's Affidavit does *not* controvert this fact, which means he admits he failed to exhaust his administrative remedies on any of the claims he is asserting in this action. However, in sharp contrast to the Affidavits of the other Plaintiffs, Mahaney's Affidavit *does not allege that anyone ever thwarted him from exhausting his administrative remedies in connection with those claims. Doc. 46 at 15–17.*

### E. The Affidavits of Taylor, Vaughn, Skinner, Wells, and Allen

These five Affidavits tell stories about how each Plaintiff was "thwarted" from exhausting his administrative remedies. Despite the wealth of documents that each of these Plaintiffs should have in his possession to support his claims of being thwarted, none of them have attached a single copy of a BP-8, BP-9, or email that they claim to have submitted to staff or the Warden, only to have it "ignored" or "thrown away."[17] As a result, there is *no evidence whatsoever* to support the entirely conclusory allegations of these Plaintiffs about being thwarted from exhausting their administrative remedies on their conditions of confinement claims.

The relevant allegations in these five Affidavits are discussed below, along with a brief explanation of why each of those Plaintiffs have failed to create a genuine issue of material fact relevant to their claims of being thwarted from exhausting the administrative remedies that *were available* to them.

1. Taylor's Affidavit (*Doc. 46 at 7–8*)

According to Taylor, shortly after COVID began to spread inside FCI/FC, "Warden Hendrix. . . initiated a town hall [meeting]…with armed guards in riot gear

---

[17] Inmates are well aware of the importance of maintaining copies of their BP-8s or BP-9s, in case they need them to prove that they were not responded to within the specified "20 calendar days following the date" of the complained-of conduct, incident, or matter. 20 C.F.R. § 542.14(a). Copies of BP-9s must also be kept by inmates so they can be attached to BP-10s submitted to the Regional Director. Additionally, § 542.14(c)(3) specifically advises inmates of the importance of retaining copies of all documents, including exhibits, related to their BP-8s and BP-9s.

and holding pepper ball air guns" and advised FCI/FC inmates that "administrative remedies are suspended due to the possibility of the spread of COVID." Affidavit of Taylor (*Doc. 46 at 7*). He later claims that he submitted "cop-outs [BP-8s]" for "cleaning supplies, soap, and mask" to Case Manager Cranberry-White, but she "either threw them away or had them sitting on her desk." *Id.* Finally, he states that "[t]he unit team [of] BOP staff are the gatekeepers and can get in direct contact with the Warden, but those gates were always closed to me and inmates." *Id.* There are several problems with Taylor's allegations.

First, Taylor's story of the "town hall meeting" goes well beyond far-fetched and enters the realm of the fantastical. According to the BOP website, FCI/FC houses approximately 1,500 low-security prisoners.[18] The idea that Warden Hendrix would bring large numbers of prisoners *together, during a pandemic,* to announce the complete suspension of the "paper administrative remedy program" as a way to reduce the spread of COVID-19 is illogical and facially unbelievable. Furthermore, the FCI/FC inmates undoubtedly would have reacted to such an alarming change in policy by bringing it to the attention of: (1) one of the many legal groups that filed class action cases over decisions made by prison administrators, during the pandemic, that allegedly violated the constitutional rights of prisoners and

---

[18] FED. BUREAU OF PRISONS, *FCI Forrest City Low*, https://www.bop.gov/locations/institutions/for/ (last visited July 19, 2021).

endangered their lives; or (2) the courts in the Eastern District of Arkansas, by filing a *Bivens* action seeking injunctive relief. To this Court's knowledge, no lawsuits raising such claims were ever initiated in the Eastern District of Arkansas; and, even more telling, none of the Plaintiffs raised this claim in their initial mis-designated § 2241 petition. In fact, the *first time* this unbelievable allegation was made was in Taylor's May 2021 Affidavit—only after Defendants brought the issue of Plaintiffs' failure to exhaust administrative remedies to light. Finally, as will be explained later, Taylor's fantastical allegation is also flatly contrary to the *undisputed fact* that four of the Plaintiffs successfully accessed and used the administrative process *after* the alleged town hall meeting took place.

Second, 28 C.F.R. § 542.14(d), explicitly authorizes an inmate in Taylor's alleged predicament to submit an Administrative Remedy Request (BP-9), marked "Sensitive Issue," directly to the "appropriate Regional Director." This administrative remedy clearly was available to Taylor and would have allowed him to raise with the Regional Director *both* his complaints about the alleged conditions in FCI/FC *and* Warden Hendrix's purported decision to suspend the "paper administrative remedy program" at FCI/FC, something that Warden Hendrix unquestionably lacked the authority to do. It seems almost certain the Regional Director would have agreed that Taylor's BP-9 raised a "sensitive issue," given the extraordinarily serious nature of his allegations, which, *if* true, might put Taylor's

life in danger. Taylor mentions nothing about pursuing this clearly *available* administrative remedy, which is explicitly described as one of the "Exceptions to initial filing [of a BP-9] at institution." *See* 28 C.F.R. § 542.14(d).

Finally, if Warden Hendrix did indefinitely suspend the "paper administrative remedy program," Taylor fails to explain why Cranberry-White *later accepted his BP-8s*. Furthermore, if as Taylor alleges, she threw his BP-8s away or refused to provide a response within 20 days, he still had the *available remedy* of submitting a BP-9 *directly to Warden Hendrix*: "If the inmate does not receive a response within the time allotted for reply [20 days], including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. § 542.18.[19]

Defendants have demonstrated that Taylor failed to exhaust his administrative remedies on the claims he is asserting in this action. Taylor's Affidavit seeks to excuse his failure to exhaust by claiming he was thwarted from pursuing his administrative remedies, without attaching any documents or other *evidence* to support his conclusory and facially unbelievable allegations. Additionally, Taylor's Affidavit does not address why he failed to pursue the administrative remedies that unquestionably *were available to him* by raising his complaint about Warden Hendrix suspending the administrative remedy program in a BP-9 filed directly with

---

[19] In this BP-9 to Warden Hendrix, Taylor could have made his complaint and explained that Cranberry-White had failed to reply to the BP-8 within 20 days. *See* 28 C.F.R. § 542.14(a).

the Regional Director; and submitting BP-9s to Warden Hendrix after staff allegedly failed to respond to his BP-8s.

Accordingly, Taylor has failed to raise a genuine issue of material fact relevant to his factually unsupported and conclusory claims of being thwarted from exhausting his administrative remedies.

2. Vaughan's Affidavit (*Doc. 46 at 9–10*)

Vaughan provides the following excuse for failing to exhaust his administrative remedies:

> While the pandemic was in full stride. . . [I] made several attempts in the B-P process, only to receive no response at all. When this inmate questioned 'Holst,' the W-C counselor. . . [I] observed [my] BP-8 still sitting on Holst's desk after two weeks. When. . . [I] asked Holst what was going on, he stated the Warden told him to throw all of the BP-8s in the garbage, halting this inmate's efforts. When [I] tried to bypass the first step, [I] was informed that I needed the response from the BP-8 in order to submit a BP-9, and the Warden wouldn't accept a BP-9 if there was no response to a BP-8.
>
> [I] notified Mr. O'Kane, the Unit Manager, Holst, the Counselor, P. A. Wingo and other medical personnel; [sic] personally, through electronic email and through the paper BP-8 procedures, . . . [about Warden Hendrix not accepting BP-9s if there was no response to a BP-8] and I did not receive a positive response from either of them.

*Doc. 46 at 9.*

First, when Holst allegedly told Vaughan that "the Warden [Hendrix] told him to throw all of the BPs into the garbage" and "the Warden wouldn't accept a BP-9 if there was no response to a BP-8," Vaughan had the *available* administrative remedy

of submitting a BP-9, marked "Sensitive Issue," directly to the Regional Director. In this BP-9, Vaughan could have raised his conditions of confinement complaints and explained to the Regional Director that he was having to do so because Warden Hendrix was preventing him, and all other FCI/FC inmates, from submitting BP-9s. Vaughan's Affidavit makes it clear he did not purse the *available* administrative remedy of submitting a BP-9, marked "sensitive," to the Regional Director. *See* 28 C.F.R. § 542.14(d)(1).

Second, while Vaughan may have *subjectively believed* he could not submit a BP-9 to Warden Hendrix until he had received a response to his BP-8 from Holst, § 542.14(a) and § 542.16 make it clear no such response was necessary. If Holst did not respond to Vaughan's BP-8s, as he alleges, Vaughan had the *available* administrative remedy of submitting a BP-9 to Warden Hendrix on the 20th day, attaching a copy of the BP-8, and explaining that Holst had failed to provide a timely response to it. By his own admission, Vaughan never attempted to file such a BP-9 with Warden Hendrix.

Third, Vaughan has not attached copies of *any* of the BP-8s he allegedly submitted to Holst or the alleged emails and BP-8s he sent to O'Kane, Holst, and Wingo raising his alleged conditions of confinement claims, and explaining to them how he was being thwarted from exhausting his administrative remedies. *If* he prepared and submitted such BP-8s and emails to those three individuals, he

undoubtably would have kept copies of all of those documents, and he would have attached them to his Affidavit to support his otherwise entirely conclusory and implausible allegations. It defies credulity to believe that, if he *in fact* submitted all those documents to staff, he would not have attached copies of them to his Affidavit.

Finally, on August 18, 2020, and January 14, 2021, Vaughan *successfully filed* two Requests for Administrative Resolutions with Warden Hendrix. The first BP-9 (1040987-F1) requested a "waiver of the public safety factors" and the second BP-9 (1064953-F1) requested "proof of protection against COVID" *and* an adjustment to his "Violent Public Safety Factor." *See* Morris' Declaration at ¶¶14 and 15 and Attachment H. These two BP-9s constitute u*ndisputed evidence* that Vaughan was *not* thwarted from pursuing his *available* administrative remedies during the COVID-19 pandemic and further undermine the vague and conclusory allegations in his Affidavit about being thwarted.

Accordingly, Vaughn has failed to raise a genuine issue of material fact relevant to his factually unsupported and conclusory claim that he was thwarted from exhausting the administrative remedies that clearly *were available* to him.

3. Skinner's Affidavit (*Doc. 46 at 11–12*)

Skinner states that he "personally made several attempts in the B-P process, only to receive no response at all." He alleges that when he "submitted a BP-8 on the conditions of this Facility, it was discarded in the trash, never to receive a

response." *Doc. 46 at 11.*   When he "tried to bypass the first step [filing a BP-8]," he was told that he "needed the response from the BP-8 in order to submit a BP-9, and the Warden wouldn't except anything, not a single piece of paper." *Id.* Finally, like Vaughan, Skinner alleges that he notified "O'Kane, the Unit Manager," "Holst, the Counselor," and "White, a case manager," "through electronic mail and through the paper BP-8 procedure" "about his difficulties in filing BP-8s and BP-9s," but he "did not receive a response from either of them." *Id. at 12.*

The conclusory and factually unsupported allegations in Skinner's Affidavit, about being thwarted from pursuing his administrative remedies, are virtually identical to the ones made by Vaughan. For the same previously explained reasons, they fail to create a genuine issue of material fact concerning Skinner's excuses for *not exhausting his available administrative remedies.*[20]

4.  Wells' Affidavit (*Doc. 47*)

Wells alleges that he "sent a cop-out to Warden Hendrix about the living conditions in the unit ('black mold in the TV room, box lunches that were spoiled, no cleaning supplies or hard soap') . . . but I never received a reply from the Warden

---

[20] Skinner, like Vaughn, has not attached copies of the BP-9s he allegedly submitted or the emails he allegedly sent to O'Kane, Holst, and White complaining about the difficulties in filing BP-8s and BP-9s. If he, in fact, submitted those documents, it defies credulity to believe that he did not make copies *and* that those copies would not have been attached to his Affidavit to support his otherwise entirely conclusory claim of being thwarted from exhausting his administrative remedies.

. . . [which] denied me the chance to exhaust my administrative remedies." *Doc. 47 at 1–2.*[21]

According to the BOP's Administrative Remedy Record for Wells, on October 30, 2020, he submitted a BP-9 (#1054547-F1) complaining about "no hot water" and possibly other conditions of confinement created by, or the result of, the pandemic. *See* Declaration of Morris at Attachment J. Warden Hendrix *denied* Wells' BP-9 on November 3, 2020, and Wells did not appeal to the Regional Director. *Id.* Assuming this is the BP-9 Wells is referring to in his Affidavit, he in fact *did receive a Response from Warden Hendrix* that denied his conditions of confinement complaint.

Even if Wells is alleging that he submitted some other BP-9 that Warden Hendrix "ignored," it still would not be sufficient to establish he was thwarted from pursuing his available administrative remedies. Section 542.16 explicitly provides that: "If the inmate does not receive a response within the time allotted for a reply [in the case of a BP-9, 20 days], the inmate may consider the absence of a response to be a denial at that level." Thus, if Warden Hendrix did not respond to Wells' BP-9 within 20 days of its submission (which meant it was deemed to be denied), Wells

---

[21] The BOP's Administrative Remedy Program specifies that informal resolutions/BP-8s (or "cop-outs") are submitted to staff. 28 C.F.R. § 542.13(a). Administrative Remedy Requests (BP-9s) are submitted to "the institutional staff member designated to receive such Requests" (28 C.F.R. § 542.14(c)(4)) and then the Request is logged into SENTRY and forwarded to the Warden for a response (28 C.F.R. § 542.11(a)(4)). Thus, what Wells must mean is that he submitted an Administrative Remedy Request (BP-9), not a "cop-out," to Warden Hendrix.

had the *available* administrative remedy of submitting a BP-10 to the Regional Director asking for a level 2 decision. By not filing this BP-10, Wells failed to exhaust his *available* administrative remedy on his conditions of confinement complaints.

Defendants' Statement of Undisputed Facts (*Doc. 36*), establishes that Wells failed to exhaust his *available* administrative remedies. Furthermore, while Wells may *subjectively believe* that Warden Hendrix's failure to respond to his BP-9 thwarted him from proceeding to the next level of review, he is *objectively wrong*. After twenty days passed without receiving a response from Warden Hendrix, the BP-9 was deemed to be denied. In order to exhaust that BP-19, Wells was required to submit a BP-10 to the Regional Director.

Accordingly, nothing in Wells' Affidavit creates a genuine issue of material fact surrounding his failure to exhaust what Defendants have established were *available* administrative remedies.

5. Allen's Affidavit (*Doc. 46 at 13–14*)

Allen's excuses for failing to exhaust his *available* administrative remedies appear to be almost word for word the same excuses given by Vaughan and Skinner. Like Vaughan and Skinner, Allen does not attach to his Affidavit copies of any of the allegedly thrown away or ignored copies of emails to O'Kane, Holst and White explaining how he was being thwarted from exhausting his administrative remedies.

For the same previously explained reasons that Vaughan's and Skinner's allegations of being "thwarted" fail to create a genuine issue of material fact surrounding their failure to exhaust their *available* administrative remedies, Allen's equally conclusory and factually unsupported allegations also fail.

6. Mahaney's Affidavit (*Doc. 46 at 15–17*)

In the first four paragraphs of Mahaney's Affidavit, he describes how he unsuccessfully submitted a request for compassionate release to Warden Hendrix, and later pursued the same relief before United States District Judge Brian S. Miller, who also denied the request.

The last paragraph of his Affidavit describes the allegedly unconstitutional conditions of confinement that he experienced at FCI/FC during the COVID pandemic. However, *nothing* in his Affidavit addresses: (1) whether he ever attempted to exhaust his administrative remedies on any of those conditions of confinement complaints; or (2) how, if at all, he was "thwarted" from using the Administrative Remedy Program to exhaust those complaints.

Accordingly, Defendants are entitled to summary judgment based on Mahaney's demonstrated failure to exhaust his *available* administrative remedies on the claims he is asserting in this action.

28

**F. Under Controlling Case Law, Defendants Are Entitled to Summary Judgment.**

In *Scott v. Harris*, 550 U.S. 372 (2007), Justice Scalia, writing for the majority, forcefully stated the controlling law explaining why Defendants' Motion for Summary Judgment should be granted:

> …when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. **When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.**

550 U.S. at 380–81 (cleaned up) (emphasis added); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (explaining that the party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual allegations).

Applying these legal principles, in the context of § 1983 and *Bivens* actions, Courts have required inmates to produce documents or other evidence to substantiate allegations in their Affidavits of being thwarted by prison staff from exhausting administrative remedies. For example, in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Court held that an inmate's submission of numerous administrative dispositions

supporting his claims of being thwarted from exhausting administrative remedies was sufficient to reverse the trial court decision granting defendants' motion for summary judgment and remanding the case to the trial court "for further consideration of whether Blake had 'available' remedies to exhaust." *Id. at* 1862. *Accord: Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir.) (en banc), *cert. denied*, 574 U.S. 968 (2014) (Once defendants have carried their burden to prove that the prisoner failed to exhaust available remedies, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made…available administrative remedies effectively unavailable to him.")

Similarly, in *Nixon v. Sanders*, 243 F. App'x 197 (8th Cir. 2007) (unpublished), Nixon admitted that he failed to exhaust administrative remedies on his First Amendment claim, but alleged he was thwarted from doing so because prison staff denied him access to the BP-9, BP-10, and BP-11 forms required to grieve the religious harassment claim that was the subject of his *Bivens* action. *Id.* at 199. In his affidavit, he attached copies of multiple letters he wrote to the Warden, staff members, and others complaining about being denied the necessary grievance forms, as well as copies of his allegedly ignored BP-8 forms. *Id.* at n.1. The Court concluded that these supporting documents were sufficient to raise genuine issues of material fact concerning whether Nixon was thwarted from exhausting his available administrative remedies. Thus, it vacated the district court's dismissal of Nixon's

claims for failure to exhaust, and remanded the case for further proceedings. *Id.* at 199.

In *Gibson v. Weber*, 431 F.3d 339 (8th Cir. 2005), three inmates appealed the district court's decision granting summary judgment based on their failure to exhaust administrative remedies. The inmates argued that they were thwarted from properly exhausting their claims by "unnamed prison and healthcare personnel [who] had 'made it clear' to them that they should voice all complaints regarding medical care informally to medical personnel [rather than filing grievances]." *Id.* at 341. The Court affirmed the district court's decision granting summary judgment because the inmates had not come forward with any evidence that prison officials had thwarted them in initiating or pursing a grievance raising their inadequate medical care complaints:

> We have only excused inmates from complying with an institution's grievance procedures when officials have prevented prisoners from utilizing the procedures...or when officials themselves have failed to comply with the grievance procedures. *An inmate's subjective belief that the procedures were not applicable to medical grievances "does not matter" and is not determinative.*
>
> Appellants have presented no evidence that any prison official thwarted an attempt to initiate the procedures or that any official made it impossible for them to file grievances.

*Gibson*, 431 F.3d at 341 (emphasis added; citations omitted); *see also Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002) ("Under the PLRA...the question is a simple one: Was there a procedure available? There is no question in this case that there

was; that Mr. Lyon was aware of it; and that he chose not to follow the steps that the procedure outlined.")

Allowing inmates to avoid the PLRA's mandatory exhaustion requirement, based solely on their factually unsupported affidavits claiming that they were thwarted from exhausting, would result in this requirement being judicially erased from the statute. To prevent that outcome, controlling case law requires inmates who make such claims to submit properly support affidavits that include evidence and corroborating documents sufficient to create a genuine issues of material fact concerning whether they were thwarted from exhausting their administrative remedies.

Here, none of the Plaintiffs have attached *a single document* (of which there should have been *many*) or other evidence to support their conflicting and facially improbable stories of being thwarted from exhausting their administrative remedies. In those cases in which inmates have been allowed to proceed with their claims of being thwarted, Courts have been careful to highlight the *specific documents or other evidence* supporting those claims, because they are *essential* to creating a genuine issue of material fact about whether administrative remedies *were available*. Likewise, in cases in which defendants have properly established an inmate's failure to exhaust administrative remedies, and the inmate has sought to counter that showing with only an affidavit containing conclusory allegations of being thwarted,

unsupported by any corroborating documents or other evidence, Courts have consistently affirmed the trial court decisions granting defendants' summary judgments.

### III.   Conclusion

Defendants' Statement of Undisputed Facts, supported by Morris' Declaration and Attachments G through L, establish that each Plaintiff failed to exhaust his administrative remedies. Because none of the Plaintiffs' Affidavits are supported by any documents or other evidence to corroborate their conclusory allegations of being thwarted, they have failed to create a genuine issue of material fact that might excuse their failure to comply with the PLRA's mandatory exhaustion requirement. Additionally, as previously explained, while Plaintiffs may have *subjectively believed* the alleged conduct of staff and Warden Hendrix "thwarted" them from pursing their administrative remedies, nothing about that conduct prevented Plaintiffs from pursing the administrative remedies that unquestionably were available to them. Accordingly, as a matter of law, Defendants are entitled to summary judgment and all of Plaintiffs' claims should be dismissed, without prejudice.

IT IS THEREFORE RECOMMENDED THAT:

1.     Defendants' Motion for Summary Judgment (*Doc. 34*) be GRANTED.

2.    A copy of the Order ruling on Defendants' Motion for Summary Judgment be filed in each of the six consolidated cases.

3.    If the Court adopts this Recommended Disposition, those cases should be deconsolidated, and a separate Judgment should be entered in each case which dismisses each action, without prejudice. *See Schuler v. Hutchinson*, No. 2:20-CV-100-DPM, 2020 WL 5089729 (E.D. Ark. Aug. 28, 2020) (citing *Hall v. Hall*, 138 S. Ct. 1118, 1128–31 (2018)).

4.    Plaintiffs' Motion for Summary Judgment (*Doc. 44*) be DENIED, as moot.

5.    Plaintiffs' Motion to convert their *Bivens* action back into a § 2241 habeas action (*Doc. 53*) be DENIED and *each* Plaintiff be assessed a $350 filing fee.

DATED this **20ᵗʰ** day of July, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

**Exhibit A:**
**BP-8**
**("informal resolution or "cop-out")**

BP-A0148     **INMATE REQUEST TO STAFF** CDFRM
JUNE 10
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| FROM: | REGISTER NO.: |
| WORK ASSIGNMENT: | UNIT: |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary.  Your failure to be specific may result in no action being taken.  If necessary, you will be interviewed in order to successfully respond to your request.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|

Record Copy - File; Copy - Inmate

PDF                         Prescribed by P5511

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER          **SECTION 6**

**Exhibit B:**
**BP-9**
**("Request for Administrative Remedy")**

U.S. DEPARTMENT OF JUSTICE                                      **REQUEST FOR ADMINISTRATIVE REMEDY**
Federal Bureau of Prisons

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: _____
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**




_____        _____
DATE                                                       SIGNATURE OF REQUESTER

**Part B– RESPONSE**




_____        _____
DATE                                                       WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE                          CASE NUMBER: _____

_____

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

_____        _____
DATE                                                       RECIPIENT'S SIGNATURE (STAFF MEMBER)

BP-229(13)
APRIL 1982

USP LVN                    PRINTED ON RECYCLED PAPER

# Exhibit C:
# BP-10
# (Appeal to the Regional Director)

U.S. Department of Justice

Federal Bureau of Prisons

**Regional Administrative Remedy Appeal**

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A - REASON FOR APPEAL**

_____            _____
          DATE                                    SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_____            _____
          DATE                                    REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C - RECEIPT**
                                               CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

_____            _____
          DATE                                    SIGNATURE, RECIPIENT OF REGIONAL APPEAL



USP LVN                                                          BP-230(13)
                                                                JUNE 2002

**Exhibit D:**
**BP-11**
**(Appeal to the General Counsel)**

U.S. Department of Justice[1]

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball–point pen. If attachments are needed, submit four copies. One copy each of the completed BP–DIR–9 and BP–DIR–10, including any attachments must he submitted with this appeal.

From: _____

| LAST NAME. FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL**

_____ _____
DATE                                    SIGNATURE OF REQUESTER

**Part B—RESPONSE**

_____ _____
DATE                                    GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C—RECEIPT**                                    CASE NUMBER: _____

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

_____ _____
DATE                                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN                    Printed on Recycled Paper                    BP–231(13)
APRIL 1982